IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
Case No.: 0:20-cv-61023-RAR

MATTHEW BUCKLEY and
TOP GUN OPTIONS, LLC,

      Plaintiffs,

v.

EMMETT MOORE and
TRADINGSCHOOLS.ORG,

      Defendants.
_____/

## **PLAINTIFFS' RESPONSE TO DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS**

Plaintiffs MATTHEW BUCKLEY ("Buckley") and TOP GUN OPTIONS, LLC, ("Top Gun" and collectively "Plaintiffs"), by and through undersigned counsel, hereby file their Response to Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) [ECF No. 48], stating as follows:

### **INTRODUCTION**

Defendants Emmett Moore ("Moore") and Tradingschools.org ("Trading Schools" and collectively, "Defendants") engaged in a course of conduct designed to damage and harm Plaintiffs' professional reputations as a successful entrepreneur and web-based paper trading educational platform through the publication of false statements in an article on Defendants' website ("TS.org"). The Defendants' false statements give rise to claims for (1) a violation of Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), (2) tortious interference with prospective economic advantage, (3) defamation *per se*, and (4) product disparagement and trade libel. Plaintiffs' Second Amended Complaint (the "Complaint") properly and sufficiently alleges these claims, and as such, this Court must deny Defendants' Motion.

### **FACTUAL AND PROCEDURAL BACKGROUND**

Buckley is a decorated Navy fighter pilot who founded Top Gun, an options-trading educational business, after he left the military. Compl. [ECF No. 31] ¶¶ 23-25. Through Top Gun, Buckley teaches options trading to traders of all experience levels. *Id.* ¶ 26. Moore founded TS.org

in 2013, through which he purportedly publishes blogs and reviews about investment products. *Id.* ¶¶ 47-49. Specifically, TS.org claims its contributors "dig up dirt and relentlessly search for the truth." *Id.* ¶ 50.

In reality, Defendants use deceptive tactics and TS.org as a means by which to extort money from investment school operators under the threat of publishing false and damaging articles. *Id.* ¶ 85. If businesses fail to pay, Defendants then attempt to "cash-in" after publication of the defamatory articles. Defendants then utilize a five-star rating system to drive visitor traffic to investment websites for which they receive affiliate payments. Compl. ¶ 62. Whether businesses pay up front, pay to have their review removed, or Defendants successfully steer these businesses' would-be customers to competing affiliate products, the strategies result in a financial win for Defendants.

The Defendants employed such tactics against the Plaintiffs. Prior to publishing content about Buckley, Moore contacted him through a series of emails under aliases that masked Moore's identity. Compl. ¶¶ 64-68. Eventually, Moore contacted Buckley stating that he intended to write an article about the Plaintiffs and demanded that Buckley pay him $1,800.00 in exchange for *not* writing the article. *Id.* ¶¶ 69-73. Moore warned Buckley that TS.org would "nail" Plaintiffs if they failed to pay. *Id.* ¶ 73. Buckley refused, and, on June 8, 2017, Defendants wrote and published a "review" of Top Gun ("TGA") containing numerous false statements. *Id.* ¶¶ 73, 77, 78.

Following publication of the TGA, Moore continued to post false and defamatory content in the form of comments on the same webpage as the TGA using both his own name and, as before, alias accounts. Compl. ¶¶ 135-69, 208, 212-14, 285-91, 304. The Plaintiffs sent correspondence through their agents demanding that the Defendants remove the TGA and false statements. Id. ¶¶ 220-222, 228, 231. The Defendants failed to do so. In fact, the Defendants never responded. Compl. ¶¶ 223, 225, 227, 229, 232. On May 22, 2020, Plaintiffs filed their Complaint against Defendants [ECF No. 1] and since have filed their four-count Second Amended Complaint [ECF No. 46]. On December 7, 2020, Defendants filed their Motion to Dismiss ("Defs' Motion") [ECF No. 48], to which Plaintiffs now respond.

## STANDARD

In ruling on a Rule 12(b)(6) motion to dismiss, the Court must determine if the complaint contains sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face. *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007). The inquiry is limited to

whether the plaintiff has stated a cognizable claim, not whether the plaintiff will prevail on the merits. *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 (1974). "A well-pleaded complaint may proceed even if it appears 'that a recovery is very remote and unlikely.'" *Bell Atl. Corp.*, 127 S. Ct. at 1964 (*citing Scheuer*, 416 U.S. at 94). Courts will grant a motion to dismiss only if it appears beyond a doubt that the plaintiff can prove no set of facts that would entitle it to relief. *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984).

## ARGUMENT

Because each of the Defendants' arguments fail to overcome the Plaintiffs' well-plead claims, the Court should deny Defendants' Motion and rule in Plaintiffs' favor.

**I.      Plaintiffs State a Claim for Defamation *Per Se***

The Plaintiffs sufficiently plead a claim for defamation *per se*. In an effort to overcome this, the Defendants argue that (1) Plaintiffs did not send a pre-suit notification required by Fla. Stat. § 770.01; (2) the statute of limitations ("SOL") bars claims regarding the TGA and comments published prior to May 22, 2018; and (3) comments published after May 22, 2018, constitute opinion, rhetorical hyperbole, or both. These arguments fail.

### *a. Pre-Suit Notice Under Florida Statute Section 770.01*

The Defendants explicitly instruct potential litigants not to contact them absent a court order and claim that they are non-media defendants for the purposes of the statute. They should not, therefore, enjoy the benefit of a required pre-suit notification under Florida Statute § 770.01. This language notwithstanding, Plaintiffs sent pre-suit notice on multiple occasions. *Id.* ¶¶ 220-32.

#### *i. The Defendants Waived Pre-Suit Notice*

To begin with, the Defendants explicitly waive any notice requirement. Specifically, Defendants state in the TS.org Terms of Service that, "unless you have obtained a valid court order proving that something in a post is false, please do NOT ask us to remove content on the grounds that it is false…[w]e are not the truth police and will not remove content just because someone has made an unverified claim that a post is false" ("No Contact Request"). Compl. ¶ 218. Through their No Contact Request, Defendants expressly waive pre-suit notification. *Id.* Obviously, for any plaintiff to obtain "a valid court order proving that something in a post is false," they would need to first file suit against Defendants. *Id.* Consequently, Defendants not only waive pre-suit notice but actually invite litigation. *Id.* To be sure, this diverges from the spirit and purpose of pre-suit

3

notification to encourage resolution of disputes prior to litigation. *See Tobinick v. Novella*, No. 9:14-CV-80781, 2015 U.S. Dist. LEXIS 31884, at *25 (S.D. Fla. Mar. 16, 2015).

Although no Florida court has addressed waiver in the context of pre-suit notice pursuant to § 770.01, Florida courts have addressed waiver of pre-suit notice required by Fla. Stat. § 766.106 in the context of medical malpractice claims. Courts have held the requirement waived where, as here, there was a clear implication that notice would be unnecessary. *Meridian Pain & Diagnostics, Inc. v. Greber*, 197 So. 3d 153, 156 (Fla. 3d DCA 2016) (affirming trial court's determination that Petitioners waived pre-suit notice and investigation where their correspondence "clearly implied that pre-suit notice and investigation would be unnecessary").

Not surprisingly, Defendants fail to address their waiver of notice. See generally, Defs' Mot. In short, Defendants should not be permitted to instruct parties to forgo pre-suit notices and then raise 770.01 as a defense later. Thus, this Court should hold the waiver against them.

### ii. *The Defendants are not "Media Defendants"*

More broadly, the § 770.01 pre-suit notice requirement applies only to media defendants. *Comins v. VanVoorhis*, 135 So. 3d 545, 549 (Fla. 5th DCA 2014). "In defining the term 'media defendant,' courts have considered whether the defendant engages in the traditional function of the news media, which is to initiate uninhibited, robust, and wide-open debate on public issues." *Tobinick*, 2015 U.S. Dist. LEXIS 31884, at *27 (quotations omitted). A court considers a defendant's publication an "other medium" entitled to pre-suit notice only if the court determines it is "operated to further the free dissemination of information *or* disinterested and neutral commentary or editorializing as to matters of public interest." *Comins*, 135 So. 3d at 559 ("We are not prepared to say that all blogs and all bloggers would qualify for the protection of section 770.01"); *see also Mazur v. Baraya*, 275 So. 3d 812, 817 (Fla. 2d DCA 2019); *Mancini v. Personalized Air Conditioning & Heating*, 702 So. 2d 1376, 1380 (Fla. 4th DCA 1997) (non-media defendants are "third parties [] not engaged in the dissemination of news and information").

Despite Defendants' claims on TS.org, they do not author and publish "honest reviews about all sorts of investment products." Compl. ¶¶ 55-59. Instead, Defendants write fake reviews and subsequently demand money from businesses under threat of publication. *Id.* ¶¶ 63, 69-85. And in fact, as described above, Moore contacted Buckley in 2017 and demanded $1,800.00. *Id.* ¶¶ 69-73. Under Florida law, Moore's demand amounted to criminal extortion. *See* Fla. Stat. § 836.05 (whoever "verbally or by a written or printed communication…maliciously threatens an

injury to the…reputation of another…with intent thereby to extort money…"). Consequently, Defendants do not qualify as an "other medium" entitled to § 770.01 protection. *See id.*

Based on the foregoing, the Court can determine as a matter of law that Defendants do not constitute an "other medium" entitled to pre-suit notification under § 770.01. At the very minimum, the Compliant contains sufficient factual allegations about the Defendants' conduct and motives to create a question of fact to survive a determination against the Plaintiffs on this issue.

### iii. *Plaintiffs Sent Pre-Suit Notice*

Despite the foregoing and contrary to Defendants' assertions, Plaintiffs in fact complied with §770.01 when they sent pre-suit notice on five separate occasions. Between February 22, 2019 and September 24, 2019, Plaintiffs sent Defendants four separate emails that (1) identified the url for the TGA; (2) represented that the article contained "slanderous, defamatory material" about Plaintiffs; (3) demanded the removal of the TGA; and, (4) explained that Plaintiffs intended to file a lawsuit absent removal. Compl. ¶¶ 220, 222, 224, 226, 228; *see generally* Compl. Ex. A. On February 26, 2020, Plaintiffs, through prior counsel, sent a demand letter to Defendants that (1) identified the article's url; (2) represented the article contained inaccurate information designed to maliciously harm Plaintiffs; (3) argued the article to be provably false; (4) demanded removal; (5) explained Plaintiffs intended to file a lawsuit absent removal; and, (6) stated Defendants had 10 days in which to comply. Compl. ¶¶ 230-31; *see generally* Compl. Ex. A. Clearly, the Plaintiffs sent pre-suit notice.

In their Motion, Defendants disagree and rely on *Tobinick* in which the plaintiff never sent notice to the defendants prior to filing suit. 2015 U.S. Dist. LEXIS 31884, at *11-12. Rather, the plaintiff sent notice *after* the plaintiff filed suit. *Id.* Consequently, *Tobinick* is distinguishable. *Id.*; *see generally* Compl., Ex. A. To the extent that Defendants argue the notices did not suffice because they did not specify the particular statements alleged to be false and defamatory (Defs' Mot., p. 6), Plaintiffs complained of the entire TGA given approximately seventy-five percent (75%) of the TGA contains (1) verifiably false statements about the Plaintiffs; (2) offensive characterizations of Buckley such as likening him to something Donald Trump would produce while sitting on a commode; (3) comparisons of Buckley's trading skills to those of Moore's dog-walking niece; and, (4) unverifiable conversations between Moore and Buckley's alleged former customers. *Id.* ¶ 235. As such, and based on the Defendants' extortive intent, Plaintiffs identified

5

and requested for removal the entire TGA in its entirety.[1] *Id.* ¶¶ 233, 236-39. Thus, Plaintiffs notices satisfy §770.01.

Based on the foregoing, this Court must conclude that Defendants do not enjoy pre-suit notice under § 770.01 based on waiver and the nature of their conduct and publication. Alternatively, should the Court disagree, the Court certainly must determine that Plaintiffs sufficiently sent notice to satisfy § 770.01.

### *b. Plaintiffs' Defamation Per Se Claim Is Within the Statute of Limitations*

The statute of limitations does not bar the Plaintiffs' defamation claim against Defendants. Section 770.07 of the Florida Annotated Statutes states that a "cause of action for damages founded upon a single publication…shall be deemed to have accrued at the time of the first publication…." Fla. Stat. § 770.07. However, the statute of limitations can be reset when a defendant republishes content. While Florida courts have been mainly silent on the application of the republication doctrine to online content, other courts addressing this elsewhere have found republication that resets the statute of limitations. Indeed, the Sixth Circuit has held that "[n]otwithstanding the single publication rule, the statute of limitations resets where the speaker republishes the defamatory statement." *Clark v. Viacom Int'l, Inc.*, 617 F. App'x 495, 504 (6th Cir. 2015) (relying on *Firth v. State*, 98 N.Y.2d 365, 370 (2002)). In *Larue v. Brown*, the court held that republication occurred when the author of an online article responded to reader comments by re-urging the truth of the article and posting additional substantive information. 235 Ariz. 440, 446 (Ct. App. 2014). Notably, the *Larue* court found determinative that, "[t]he comments were displayed directly beneath the original articles, thereby implying they were supplements to the original articles…[and in] addition, the submission dates of the new comments reflect the date the comments were added…again implying they were updating the original articles." *Id.*

Here, the facts substantially reflect those in *Larue*. Defendants did not limit publication of the TGA to a single post. Rather, Defendants engaged in affirmative behavior to reach new audiences by *consistently* adding comments to the TGA that contained substantive information about Plaintiffs. Compl. ¶¶ 135-69, 208, 212-14, 285-91, 304; *see Larue*, 235 Ariz. at 446 (holding that "Defendants republished the defamatory statements originally posted…by replying to readers' comments"). Indeed, Defendants used comments to both repeat prior material and publish

---

[1] The circumstances here do not constitute a situation where a single line or two contain inaccurate information.

additional defamatory content about the Plaintiffs. Compl. ¶¶ 135-69, 208, 212-14, 285-91, 304. Through aliases (Moore openly admits to using alias emails in the TGA, *Id.* ¶ 67) and using Moore's own name, Defendants' comments re-urge the gist of the TGA that Buckley is unprofessional, incompetent, and the Plaintiffs run a scam. *Id.* These comments are situated directly beneath the TGA itself, similar to *Larue*. *Larue*, 235 Ariz. at 446. The publication of these additional comments constituted republication and reset the statute of limitations. *See Clark*, 617 F. App'x at 504.

The foregoing comports with a modern understanding and application of the republication rule in today's online context. Indeed, consider the Sixth Circuit's analysis in *Clark*:

> The general rationale behind the rule is that if the speaker affirmatively says the same thing again at a later time to a new audience, then he has intended to engender additional reputational harm to the plaintiff. In the traditional print context, the critical consideration is not whether the substance of the statement has changed. Instead, the key factor is whether the speaker 'intended to and does reach a new [audience].' Thus, a…new edition of a book—even if substantively identical to the initial iteration…such as a paperback edition of a previously published book…generally will reset the limitations period, because each is produced to garner an audience that the preexisting dissemination of the statement could not reach.

*Clark* at 504-05 (supporting citations omitted). Defendants' conduct here is analogous to publishers reprinting books in paperback seeking to capture new audiences with subsequent printings (presumably people unwilling or unable to purchase a more expensive hardback).

Compare *Larue* with the distinguishable Ninth Circuit case of *Yeager v. Bowlin* upon which Defendants rely. 693 F.3d 1076, 1082 (9th Cir. 2012). The plaintiff in *Yeager* attempted to argue that republication occurred each time a website added or revised content, *even if the new content did not reference or depict the Plaintiff*. *Id.* In other words, if a website simply updated their homepage or changed the layout of a sidebar, those actions would result in republication. Unlike *Yeager*, here, as in *Larue*, the Defendants posted comments about the Plaintiffs to the original publication, which re-urged defamatory material in the TGA and added additional false content. Compl. ¶¶ 135-69, 208, 212-14, 285-91, 304; *Larue*, 235 Ariz. at 446. While otherwise distinguishable, even the court in *Yeager* held that a republication occurs when "the statement itself is substantively altered or added to, or the website is directed to a new audience." *Yeager*, 693 F.3d at 1082.

7

Based on the foregoing, republication of the article occurred with each new comment by Moore (using his own name or an alias) to the TGA. Moore published his most recent comment prior to the filing of this lawsuit on January 29, 2019. Compl. ¶ 210. Thus, Plaintiffs filed suit well within the two-year SOL for defamation. Fla. Stat. § 95.11(4)(g).

### *c. Defendants' Statements Are Neither Protected Opinion Nor Rhetorical Hyperbole*

Defendants do not address whether statements made prior to May 22, 2018 are defamatory *per se*. Defs' Mot., pp. 7-11. Therefore, for purposes of this motion, any such arguments are waived and Plaintiff's claims based on those statements should survive Defendants' Motion. Thus, for the purposes of this section, Plaintiffs only address those statements made before May 22, 2018 where they give context to other statements made within the TGA and its comments. Should the Court determine statements made prior to May 22, 2018 need to be addressed, Plaintiffs reserve the right to do so.

"Whether [a] statement is one of fact or opinion and…susceptible to defamatory interpretation are questions of law for the court." *Turner v. Wells*, 879 F.3d 1254, 1262-63 (11th Cir. 2018) (relying on *Keller v. Miami Herald Pub. Co.*, 778 F.2d 711, 714-15 (11th Cir. 1985)). A defendant "publishes a 'pure opinion' when the defendant makes a comment or opinion based on facts which are set forth in the publication or which are otherwise known or available to the reader or listener as a member of the public." *Turner*, 879 F.3d at 1262 (relying on *From v. Tallahassee Democrat, Inc.*, 400 So. 2d 52, 57 (Fla. 1st DCA 1981)). Conversely, mixed opinion involves statements that are based upon facts that are "neither stated in the publication nor assumed to exist by a party exposed to the communication." *Folta v. N.Y. Times Co.*, No. 1:17cv246, 2019 U.S. Dist. LEXIS 34533, at *31 (N.D. Fla. Feb. 27, 2019) (quoting *Fla. Med. Ctr., Inc. v. New York Post Co.*, 568 So. 2d 454, 457 (Fla. 4th DCA 1990)). For statements to be rhetorical hyperbole, the statement must be so unbelievable, on its face or in its wider context, that no reasonable reader could believe it was true. *Seropian v. Forman*, 652 So. 2d 490, 491-93 (Fla. 4th DCA 1995).

The gist or sting of the TGA is an effort to harm Plaintiffs by destroying their reputation through accusations of criminal conduct, dishonesty, fraud, and misrepresentations as to Plaintiffs' business model. Compl. ¶ 132. In *Carroll v. TheStreet.com, Inc.*, the court held that as a matter of law, "statements labeling [the plaintiff] a 'convicted felon,' 'con artist,' and 'troubling character'…[were] injurious on their face and require[d] no extrinsic evidence to establish their

8

defamatory meaning…[t]herefore the statements [were] defamatory *per se*." No. 11-CV-81173, 2014 U.S. Dist. LEXIS 156499, at *45 (S.D. Fla. July 7, 2014).

Here, for example, Defendants falsely accuse the Plaintiffs of engaging in criminal activity. Compl. ¶ 293. Florida case law is clear that accusations of criminal conduct are not opinion and are defamatory *per se*. *Carroll*, 2014 U.S. Dist. LEXIS 156499, at *45. Therefore, these statements are not opinion and the claim as to these statements should not be dismissed.

The statements in question (those made after May 22, 2018) all reflect the same thrust or gist as "con artist" and "troubling character," especially when understood within the context of the TGA and its comments. *See Folta*, 2019 U.S. Dist. LEXIS 34533, at *28 ("In determining the availability of a defamatory meaning for a given statement, a court considers the statement in the context of the publication as a whole…[a] court must consider a publication in its totality") (relying on *Byrd v. Hustler Magazine, Inc.*, 433 So. 2d 593, 595 (Fla. 4th DCA 1983). A comment by "Mark" made on September 25, 2017, falsely stated Buckley was a "con man."[2] Compl. ¶ 293. Mark followed this with a comment on December 25, 2017, in which he again falsely equated Buckley to "many con men." *Id.* ¶ 294. Mark then published a comment on May 23, 2018, in which he stated, "Buckley will ride this con into the dirt." Contrary to Defendants' argument, when his statement is read in its entirety, and together with his previous comments, Mark clearly makes a factual assertion that Buckley is a "con man" and his business, Top Gun Options, is a "con" (or the vehicle for Buckley's con). Defs' Mot., p. 8.[3] The term "con man" and "con artist" (held to be defamatory *per se* in *Carroll*) are interchangeable and a "con" is the ruse or swindle or confidence game a "con man" perpetrates on another. *Carroll*, 2014 U.S. Dist. LEXIS 156499, at *45. Read together with his other comments and the tenor of the TGA, it is clear Mark falsely claims Buckley is not providing a valuable trading education in exchange for subscription fees, but is instead defrauding people of their money. *See Fun Spot of Fla., Inc. v. Magical Midway of Cent. Fla.,*

---

[2] All of the anonymous comments by Mark, Jim, Sam, and Olio were actually made by Defendants. Compl. ¶¶ 172, 177, 183, 188, 193, 202, 210.

[3] Defendants attempt to compare Mark's comments to the letter at issue in *Colodny v. Iverson*, but the cases are distinguishable. 936 F. Supp. 917 (M.D. Fla. 1996); Defs' Mot., p. 8. In *Colodny* the defendant had a cautionary modifier in his statement, the facts behind his statement were publicly available, and his complaints were leveled at the judicial system, not the plaintiff individually. *Colodny*, 936 F. Supp. at 923-24.

*Ltd.*, 242 F. Supp. 2d 1183, 1197 (M.D. Fla. 2002) (holding a false statement which suggests that someone has committed a dishonest or illegal act is *per se* actionable).

In another comment posted on February 15, 2020, "Jim" stated he "1000% incontrovertibly agree[d] with the scammer comments here." Compl. ¶¶ 196, 298. Similarly, "Sam" posted a comment on September 7, 2019, that falsely stated "Top Gun options is a sham." *Id.* ¶¶ 186, 296. Yet another comment posted by "Olio" on October 12, 2018, advised Plaintiffs' potential customers to "buyer beware." *Id.* ¶¶ 191, 297. As argued above, read within the context of the TGA and the surrounding comments, Jim's use of the word "scammer," Sam's use of the word "sham," and Olio's warning for buyers to beware clearly imputed that Plaintiffs were tricking or deluding subscribers out of their money. *See Fun Spot of Fla., Inc.*, 242 F. Supp. 2d at 1197. Jim, Sam, and Olio, like Mark, went beyond reviewing the Top Gun Options product, and instead inferred that Plaintiffs engaged in affirmative behavior to mislead subscribers and take their money. Compl. ¶¶ 172, 177, 183, 188, 193, 202, 210. In fact, Jim's use of the phrase "1000% incontrovertibly agree" emphasizes his assertion that Plaintiffs, for a fact, operate a scam and the evidence is incontrovertible. *Id.* ¶ 196. "Scammer," "Sham," and buyer beware," like "con man," all belong to the same category of words as "con artist" and "troubling character" the court in *Carroll* held to be defamatory *per se*. *Carroll,* 2014 U.S. Dist. LEXIS 156499, at *45; *see also Fun Spot of Fla., Inc.*, 242 F. Supp. 2d at 1197.

Based on the foregoing and accepting Plaintiffs' well-pleaded allegations as true, this Court must deny Defendants' Motion as: (1) Plaintiffs properly served Defendants pre-suit notification, though they were not entitled to such notification; (2) Plaintiffs' defamation and trade libel claims are not time barred; and (3) those statements made on or after May 22, 2018, are not protected opinion and are defamatory *per se*.

## II.     Defendants Are Not Immune Under the Communications Decency Act

The Defendants do not benefit from the Communications Decency Act, 47 U.S.C. § 230 ("Section 230"). The Defendants author and publish content at their site. Clearly, they do not benefit from Section 230 as to their own content. *See Whitney Info. Network, Inc. v. Xcentric Ventures, Ltd. Liab. Co.*, 199 F. App'x 738, 744 (11th Cir. 2006) (stating that defendants were not entitled to Section 230 immunity when plaintiff alleged defendants created and developed defamatory content on defendants' website) (relying on *Hy Cite Corp. v. Badbusinessbureau*, 418 F. Supp. 2d 1142, 1147-48 (D. Ariz. 2005)).

Arguably, the Defendants contend that Section 230 applies to comments authored and posted to the TGA by third parties. Here, Plaintiffs allege that Moore authored comments under his own name and through alias accounts for Mark, Sam, Olio, and Jim. Compl. ¶¶ 172, 177, 183, 188, 193, 202, 210. As the Defendants acknowledge, these allegations "must be taken as true for purposes of Defendants' 12(b)(6) motion." Defs' Mot., p. 7. Thus, at least at this stage, Section 230 would not apply. *Whitney Info. Network, Inc.*, 199 F. App'x at 744.

Even for actual third-party comments posted in response to the Defendants' content, Section 230 should not apply. *See Fla. Abolitionist v. Backpage.com, LLC*, No. 6:17-cv-218-Orl-28TBS, 2018 U.S. Dist. LEXIS 55560, at *10 (M.D. Fla. Mar. 31, 2018)  (holding that ruling on a motion to dismiss based on Section 230 immunity was improper where plaintiffs had alleged "facts suggesting that Defendants materially contributed" to the defamatory content). Clearly, Defendants constitute "publisher[s] or speaker[s]" for which Section 230 provides no protection. *See* 47 U.S.C. Sec. 230(c)(1). As such, Plaintiffs' claims unquestionably survive a Section 230 analysis.

### III. Plaintiffs Properly Plead Their Claim Under FDUTPA

Defendants attempt a flawed three-pronged attack on Plaintiffs' FDUTPA claim (Fla. Stat. § 501.201, *et*. *seq*.): (1) Plaintiffs did not allege a consumer injury; (2) Plaintiffs did not plead actual damages; and (3) Plaintiffs did not plead factual allegations that Defendants' conduct occurred within Florida.

#### *a. The Plaintiffs Alleged a Consumer Injury*

The Florida legislature in 2001 amended FDUTPA to substitute the term "person" for "consumer" as to who has standing to bring a FDUTPA claim. Florida state courts have uniformly held that due to this amendment claimants need not be a consumer to bring a FDUTPA claim. *Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA. 2015); *Bailey v. St. Louis*, 196 So. 3d 375, 383 (Fla. 2d DCA 2016); *Off Lease Only v. LeJeune Auto Wholesale*, 187 So. 3d 868, 870 (Fla. 3d DCA 2016). Federal district courts interpreting state law "are bound to follow any decision of the state's intermediate appellate courts" when a state supreme court has not ruled on an issue. *See CWELT-2008 Series 1045 LLC v. PHH Corp.*, No. 1:20-cv-20334, 2020 U.S. Dist. LEXIS 91899, at *14 (S.D. Fla. May 27, 2020) (discussing the court's ruling in *Caribbean* and subsequent state cases). Here, Plaintiffs allege a

pattern of deceptive and unfair practices by Defendants that mislead reasonable consumers and ultimately caused Plaintiffs' actual damages. *See generally* Compl.

Defendants operate a website in which Moore threatened to publish damaging articles (likely replete with false and defamatory information as in the instant case) unless Plaintiffs paid a sum of money. Compl. ¶ 64-77; *see also Kertesz v. Net Transactions, Ltd.*, 635 F. Supp. 2d 1339, 1348 (S.D. Fla. 2009) ("an unfair practice is one that offends established public policy and is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers"). When the threat failed, as noted above, Defendants then published an article on their website containing false content about the Plaintiffs. Compl. ¶¶ 78-134. Meanwhile, Defendants publicly state that they "dig up the dirt and relentlessly search for the truth," and maintain the "entire site runs on income from…advertising…[w]e won't write fake reviews…hoping to make a quick affiliate commission." Compl. ¶¶ 50-51. Moreover, Defendants steer business towards paid affiliates. *Id.* ¶ 62. One example, "Best Stock Strategy with David Jaffee" ("BSS"), charges twice the rate of Top Gun Options. As a result of Defendants' fake reviews—both about Top Gun and other businesses, some costing no more than a few hundred dollars—visitors to Defendants' website were misled into buying more expensive products, and thus a consumer injury clearly occurred. *See Kertesz*, 635 F. Supp. 2d at 1348 (a "deceptive practice is one that is likely to mislead").

### b. *Plaintiffs Alleged Actual Damages*

Defendants' second argument likewise fails as Plaintiffs properly plead actual damages. In their SAC, Plaintiffs twice state that because of Defendants' conduct, Plaintiffs expended money on reputation management services. Compl. ¶¶ 240, 266. Defendants incorrectly argue Plaintiffs identified Business Image Lift, LLC ("BIL"), as the reputation management service in question. Thus, Plaintiffs will not address Defendants' BIL arguments, aside from the proposition "'reputation repair' is inseparable and derivative from loss of reputation, and therefore per se consequential damages of alleged reputational harm." Defs' Mot., p. 15. For this argument, Defendants rely on *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212, 2016 U.S. Dist. LEXIS 23033 (S.D. Fla. Feb. 25, 2016). The instant case is distinguishable, as the plaintiff in *BPI Sports* merely plead "harm to the goodwill and reputation of BPI," and the court noted, "[t]he harm allegedly incurred relates to BPI's purportedly lost profits and business." *BPI Sports*, 2016 U.S. Dist. LEXIS 23033 at *4, 17. Here, Plaintiffs spent money on reputation services to combat the negative effects of Defendants' conduct on Top Gun's product prices. Compl. ¶¶ 240, 266.

Defendants also argue past lost profits (as alleged by the Plaintiffs) are not actual damages recoverable under FDUTPA. Defs' Mot., p. 14-15. However, the Florida Supreme Court has yet to decide what types of actual damages are available to a non-consumer business after 2001 (when the legislature amended FDUTPA from "consumer" to "person" and gave businesses standing to sue). *See Bailey v. St. Louis*, 196 So. 3d 375, 382-83 (Fla. 2d DCA 2016). Federal courts in Florida have found that past lost profits constitute actual damages under FDUTPA. *See; ADT LLC v. Alarm Prot. Tech. Fla.*, LLC, No. 12-80898-CIV, 2013 U.S. Dist. LEXIS 190106, at *17-18 (S.D. Fla. Apr. 18, 2013) (holding that the consumer-case measure of damages is meaningless in the context of a competitor's claim, with actual damages being "actual lost profits")*Factory Direct Tires, Inc. v. Cooper Tire & Rubber Co.*, No. 3:11-cv-255-RV/EMT, 2011 U.S. Dist. LEXIS 159599 at *21 (N.D. Fla. Oct. 24, 2011) (opining that lost profits already suffered constituted recoverable actual damages under FDUTPA); *Glob. Tech LED, Ltd. Liab. Co. v. HiLumz Int'l Corp.*, No. 2:15-cv-553-FtM-29CM, 2017 U.S. Dist. LEXIS 20512, at *24-25 (M.D. Fla. Feb. 14, 2017) ("[p]ast lost profits, in turn, appear to be a proper form of 'actual' damages).

Defendants cite to cases predominantly relying on *Diversified Mgmt. Sols., Inc. v. Control Sys. Research*, which held lost profits were consequential damages. No. 15-81062-CIV, 2016 U.S. Dist. LEXIS 189771 (S.D. Fla. May 13, 2016). The court in *Diversified* relied solely on a "difference in market value" measure of actual damages, which does not account for the post FDUTPA 2001 amendment that introduced a new class of plaintiffs—businesses/competitors. Moreover, *Diversified* relied on the inapposite *Rollins, Inc. v. Butland*, which dealt with a class certification review, consumer plaintiffs (not businesses) did not seek to recover lost profits, and the court did not discuss the 2001 FDUTPA amendment nor actual damages in the non-consumer context. *See generally Diversified* 2016 U.S. Dist. LEXIS 189771 (discussing *Rollins, Inc. v. Butland*, 951 So. 2d 860, 869-73 (Fla. 2d DCA 2006)).

As such, this Court should follow the line of Florida cases since the 2001 amendment that properly interpret the legislature's intent to add businesses as well as claims for past lost profits. Based on the foregoing, it is clear that FDUTPA allows for the recovery of past lost profits as well as reputation management services, both representing actual damages to Plaintiffs.

### *d. Defendants' Violations Occurred Within The State Of Florida*

Finally, Defendants' deceptive conduct occurred in the state of Florida and thus they are subject to Plaintiffs' claim under FDUTPA. Defendants, in a scheme to extract money from Plaintiffs, published a fake review of Top Gun on TS.org. Compl. ¶¶ 69-73, 77-78. Simultaneously, as detailed above, Defendants (1) represented to readers (at least some of whom were in Florida) that the information in the TGA resulted from investigation and a search for the truth, and (2) directed those Florida-based readers through affiliate links to more expensive products.

Defendants rely on the distinguishable case of *Five for Entm't S.A. v. Rodriguez*, where the defendants, a reggaeton performer and his record label, published a one-time press release that contained false statements about the plaintiffs. 877 F. Supp. 2d 1321, 1327, 1330 (S.D. Fla. 2012). In that case, the Court found that the complaint did not adequately allege the location of the conduct, and allowed the plaintiff to replead its complaint. Here, the facts as pled do show the location of conduct and are most similar to those in *Execu-Tech Business Systems, Inc. v. New Oji Paper Co.*, where a foreign company conspired to fix prices on paper sold throughout the United States. 752 So. 2d 582, 585 (Fla. 2000). In *Execu-Tech*, the court focused on the nexus between the forum state, the foreign company, and the inflated *price* paid by Florida residents due to the defendant's wrongdoing. *Id.*

In the instant case, while Defendants are in California, they directed the TGA, at least in part, to Florida, where Plaintiffs are located. Compl. ¶¶ 11-14. In addition, Plaintiffs have alleged that readers who were misled by the deceptive blog were located in Florida and/or were considering using Plaintiffs, who are located in Florida. Compl. ¶¶ 15-16; *see Internet Solutions Corp. v. Marshall*, 39 So. 3d 1201, 1214-1216 (Fla. 2010) ("[a] nonresident defendant commits the tortious act of defamation in Florida for purposes of Florida's long-arm statute when the nonresident makes allegedly defamatory statements about a Florida resident by posting those statements on a website, provided that the website posts containing the statements are accessible in Florida and accessed in Florida"); *see also Tobinick*, 2015 U.S. Dist. LEXIS 31884, at *7 (finding *Calder* satisfied where an "intentional tort [is] aimed at a specific individual in the forum whose effects were suffered in the forum"). As in *Internet Solutions*, the violation here "occurred" in Florida when Florida consumers opened the TS.org webpage hosting the TGA and were misled by its contents. Compl. ¶¶ 79-80, 250, 265. As such, for the purposes of FDUTPA, the Defendants' acts occurred in the state of Florida and this Court should reject Defendants' argument.

### *e. Plaintiffs Are Entitled to Injunctive Relief*

In addition to damages, FDUTPA separately entitles Plaintiffs to injunctive relief. FDUTPA "permits a claim for injunctive relief by 'anyone aggrieved' by an unfair or deceptive act, which has occurred, is now occurring, or is likely to occur in the future… regardless of whether an aggrieved party can recover 'actual damages.'" *Wyndham Vacation Resorts, Inc. v. Timeshares Direct, Inc.*, 123 So. 3d 1149, 1152 (Fla. 5th DCA 2012); *see also Klinger v. Weekly World News, Inc.*, 747 F. Supp. 1477, 1479-80 (S.D. Fla. 1990). As alleged in the Complaint and argued throughout this Response, because of Defendants' continuing conduct Plaintiffs will suffer irreparable damage to their reputation and customer goodwill with resultant lost business. So long as the TGA remains visible, visitors to TS.org will continue to be directed by the Defendants to affiliate sponsors. Regardless of this Court's decision as to Plaintiffs' cause for actual damages, Plaintiffs' claim for injunctive relief should remain. *See Alvi Armani Medical, Inc. v. Hennessey*, 629 F. Supp. 2d 1302, 1309 (S.D. Fla. 2008) (holding that where plaintiffs sought injunction prohibiting the publishing of any disparaging and false statements against them, Eleventh Circuit courts have held that FDUPTA offers equitable relief in the form of declaratory or injunctive relief).

Based on the foregoing, this Court should deny Defendants' Motion and allow Plaintiffs' FDUTPA claims for damages and injunctive relief to remain.

**D.     Plaintiffs' Non-Defamation Claims Arise From Separate Conduct By Defendants**

Plaintiffs' defamation *per se* claim is based on the TGA and the untruthful statements printed therein. Plaintiffs' remaining claims, however, allege an independent basis for each claim, separate from the defamatory statements of Defendants. Defendants conduct was not limited to publishing false negative reviews about Plaintiffs. Rather, Defendants redirected potential Top Gun customers towards affiliate products through positive reviews and weblinks. Plaintiffs' remaining claims all rely on this *additional* conduct by Defendants, *directing business away from Top Gun* and towards (in some cases) more expensive competitors. *See Primerica Fin. Servs. v. Mitchell*, 48 F. Supp. 2d 1363, 1368-69 (S.D. Fla. 1999) (holding that additional claims could survive as the plaintiff pled other circumstances and facts separate from the allegedly untruthful statements).

With regards to FDUTPA specifically, Plaintiffs also allege Defendants attempted to extort money from Plaintiffs prior to publishing the TGA. Additionally, Plaintiffs allege Defendants

15

misrepresented and misled consumers through the additional act of stating their reviews were truthful and the product of rigorous investigation. Plaintiffs' claim for injunctive relief under FDUTPA should proceed because it relies on Defendants' conduct separate from the defamatory remarks in the TGA. *See Alvi* at 1304-05 (holding that the plaintiff's FDUTPA claim could proceed because the complaint "alleged an independent basis…namely, [d]efendants' deceptive and misleading conduct, separate and apart from defamatory statements").

Based on the foregoing, this Court should allow the Plaintiff to maintain claims for a violation of FDUPTA, tortious interference, and product disparagement and trade libel.

## IV.     This Court Should Not Apply Florida's Anti-SLAPP Statute

For reasons similarly argued above with regard to 770.01 pre-suit notification, Defendants' conduct precludes their protection under Fla. Stat. Sec. 768.295. As noted by Defendants, Florida enacted its anti-SLAPP statute to protect statements from those *primarily* exercising the right to free speech in connection with public issues from lawsuits *without merit*. Defs' Mot., p. 19; Fla. Stat. Sec. 768.295(1)(emphasis added). Here, the TGA constitutes the product of a scheme to extort money from Plaintiffs and not *primarily* (or even minimally) associated with Defendants' exercise of free speech. Compl. ¶¶ 69-79, 83, 261-262. This is inapposite to the unpublished decision Defendants cite, *Parekh v. CBS, Corp.*, which involved a news reporter and a major news network whose statements were clearly not defamatory *per se*. *Parekh v. CBS Corp.*, No. 19-11794, 2020 U.S. App. LEXIS 19167, at *18 (11th Cir. June 19, 2020).

Here, in addition to Defendants' extortive conduct and misrepresentations to consumers, they describe Plaintiffs in the TGA (and subsequent comments) as a con, scam, and sham. Compl. ¶ 314. Defendants claim Plaintiffs exhibited a lack of integrity and misrepresent the nature of their business and their success. *Id.* ¶ 318. In fact, the gist or sting of the entire TGA was to falsely accuse Buckley of being dishonest and Plaintiffs of running a dishonest business. *Id.* ¶ 321.

The anti-SLAPP statute states that a lawsuit may not be filed "without merit." Fla. Stat. Sec. 768.295(3). A court in this District addressed this issue in a recent case stating "[a]t bottom, Florida's statute is a garden variety fee shifting provision, which the Florida legislature enacted to accomplish a 'fundamental state policy'—deterring SLAPP suits. Fla. Stat. § 768.295(1)." *Bongino v. Daily Beast Co.*, LLC, 2020 U.S. Dist. LEXIS 208381, *23 (S.D. Fla., August 6, 2020). Essentially, the Rule 12(b)(6) standard is higher than the "without merit" standard prescribed by the Florida statute. *Id.* at 23.

While Rule 12(b)(6) requires a showing that the complaint contains sufficient factual allegations, accepted as true, to state a claim for relief that is plausible on its face; the Florida statute does not require the plaintiff to establish a probability that he will prevail on the claim asserted in the complaint and therefore does not answer the same question as the Federal Rule. *See id.* at 23. Because, as set forth above, Plaintiffs' claims survive Fed. R. Civ. Proc. 12(b)(6) scrutiny, they likewise survive Florida's anti-SLAPP statute and are not without merit.

Based on the foregoing, Plaintiffs adequately plead that (1) Defendants were not primarily exercising protected free speech when they published the article and thus are not protected under 768.295; and (2) Plaintiffs plead sufficient facts to state causes of action for each claim and thus none are *without merit*. For those reasons, Defendants' anti-SLAPP arguments should fail.

## CONCLUSION

For the foregoing reasons, Plaintiffs request that this Court deny Defendants' Motion to Dismiss in its entirety with prejudice.

Dated: December 11, 2020                     Respectfully submitted,

*/s/ Elisa J. D'Amico*
Elisa J. D'Amico
FL Bar No. 76936
elisa.damico@klgates.com
**K&L GATES LLP**
Southeast Financial Center
200 S. Biscayne Boulevard, Suite 3900
Miami, Florida 33131-2399
Tel.: 305-539-3300
Facsimile: 305-358-7095

*/s/ Charles Lee Mudd, Jr.*
Charles Lee Mudd, Jr.
*Pro Hac Vice*
clm@muddlaw.com
**MUDD LAW**
411 S. Sangamon Street, Suite 1B
Chicago, Illinois 60607
Telephone: 312-964-5051

***Counsel for Plaintiffs Matthew Buckley and Top Gun Options, LLC***

**CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on December 11, 2020, a true and complete copy of the foregoing was electronically filed via CM/ECF system which will send a notice of electronic filing to all Counsel of Record.

*/s/ Elisa J. D'Amico*
Elisa J. D'Amico