UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 20-CIV-61023-RAR

**MATTHEW BUCKLEY**, *et al.*,

    Plaintiffs,

v.

**EMMETT MOORE**, *et al.,*

    Defendants.

_____/

**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS**

    **THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss Pursuant to Rule 12(b)(6) [ECF No. 48] ("Motion"). The Court having reviewed the parties' written submissions and supporting materials [ECF Nos. 48-50 and 52-54], held a hearing on the Motion on January 21, 2021 [ECF No. 77], and being otherwise fully advised, it is hereby

    **ORDERED AND ADJUDGED** that the Motion is **GRANTED IN PART AND DENIED IN PART** as set forth herein.

**BACKGROUND**

    The Court begins by setting forth the facts as alleged in Plaintiffs' Second Amended Complaint [ECF No. 46]. Plaintiff Matthew Buckley ("Buckley") is a former Navy fighter pilot who developed a strategy in trading options based on skills and insight he acquired in the military. *See* Second Am. Compl. ¶¶ 23-24. Buckley founded a company, Top Gun Options, to share his knowledge of options trading with the public. *Id.* ¶ 25. Top Gun Options uses "paper trading"— a simulated trade that allows an investor to practice buying and selling without risking real money—to educate clients about options trading. *Id.* ¶¶ 30-31. Defendant Emmett Moore

("Moore") runs a website TradingSchools.org, which purports to be "a blog about trading products" that provides "honest reviews about all sorts of investment products." *Id.* ¶¶ 47-48. Plaintiffs allege that in reality, TradingSchools.org writes "fake reviews" and does not verify the information it publishes for accuracy. *Id.* ¶¶ 55-59.

In 2017, Moore reached out to Buckley under an alias pretending to be an individual interested in learning how to profit from options trading. *Id.* ¶ 65. According to Plaintiffs, Moore "has a history of using fictitious names to hide his identity" and boasted about having used an alias when contacting Buckley. *Id.* ¶¶ 66-67. Moore then contacted Buckley again in 2017 indicating that he intended to write an article about Top Gun Options. *Id.* ¶¶ 69-70. Moore demanded that Buckley pay him $1,800 in exchange for Moore not writing the article. *Id.* ¶ 72. Moore warned Buckley that he would "nail" Buckley and his company if Buckley did not pay him the $1,800. *Id.* ¶ 73. When Buckley refused to pay Moore, Moore proceeded to publish an article about Buckley and Top Gun Options titled *Top Gun Options: A Paper Tiger?* ("Top Gun Article"). *Id.* ¶ 77-78, 87.

Plaintiffs allege that the Top Gun Article makes false statements about Buckley and his business, including (among others) the following statements:

- "Top Gun Options is an options trading signal service and educational business making big promises regarding profitability." *Id.* ¶ 91.

- "However, since [Buckley] apparently only has the courage to trade with a simulator, and admits so, this lends little confidence to his supposed ability to deliver 'real' results." *Id.* ¶ 95.

- "The style and substance of Mr. Buckley's investment educational and investment strategy appear to be little more than political rants and reactions to whatever he reads in the media." *Id.* ¶ 98.

- "Top Gun Options and Mathew [sic.] 'Whiz' Buckley claim truly incredible success for those that simply follow their options trading advisory service," and "since the inception of [Plaintiffs'] Twitter profile (2010) . . . we can find no evidence of any losing trades

whatsoever . . . however, you will easily find what appears to be a constant, and never ending stream of supposedly winning trades." *Id.* ¶ 103.

- "We also made multiple attempts at contacting Mr. Buckley . . . [o]ur official request was non-threatening and very friendly in manner . . . [w]e simply asked Mr. Buckley if he could verify the truly incredible trading performance of the supposed portfolios." *Id.* ¶ 107.

- "[H]e claims to earn these massive profits, year after year . . . [b]ut no proof seems to exist . . . [t]he only form of verification seems to be a paper trading account at Options House . . . [Mr. Buckley] expects us to take his advice-to-task, to risk our money on the front line of battle, yet he is only willing to trade in a simulator," and "[t]his brusky military man, so full of bravado appears to be little more than a paper tiger." *Id.* ¶ 114.

- Buckley showed a "high level of callousness and disdain for" a customer who sought a refund and "hustle[d] a client over a technicality [which] shows a lack of integrity . . . [h]e seems to have little regard for the legitimate concerns and opinions of others." *Id.* ¶ 120.

- "[I]f Donald Trump were to squat upon his golden plated commode and squeeze . . . then a wet, moist, and highly agitated creature would appear . . . [t]his creature is my best description of Mr. Buckley." *Id.* ¶ 124.

Plaintiffs allege that Moore actively invites the public to comment on his articles by writing at the end: "Thanks for Reading. And of course, I would love to know your opinion." *Id.* ¶ 158. They contend that Moore knows that additional content from readers' comments will keep his website "fresh" and increase traffic to the website through search engine optimization, thereby increasing Moore's advertising revenue. *Id.* ¶¶ 158-162. The Second Amended Complaint avers that the following defamatory comments were posted under the Top Gun Article—and that the comments were either authored by Moore using a pseudonym or alternatively that Moore actively encouraged and solicited their authorship:

- A comment published by an author identified as Mark on September 25, 2017, which states in part: "if you fall for this con man, go monthly so you can escape when you regain your senses." ("Mark September 25, 2017 Comment"). *Id.* ¶¶ 170-74.

- A comment published by an author identified as Mark on December 25, 2017, which states in part: "Like many con men, sociopaths with no capacity for remorse, [Buckley] continues to talk trash without adjustment." ("Mark December 25, 2017 Comment"). *Id.* ¶¶ 175-79.

- A comment published by an author identified as Mark on May 23, 2018, which states in part: "Buckley will ride this con into the dirt, I'm sure" and "Keep in mind, if any of the quoted states [sic.], like up 48% this year, were true, Buckley would post the detailed transaction logs to demonstrate his greatness." ("Mark May 23, 2018 Comment"). *Id.* ¶¶ 180-185.

- A comment published by an author identified as Sam on September 17, 2019, which states in part: "Top Gun options is a sham." ("Sam Comment"). *Id.* ¶¶ 186-90.

- A comment published by an author identified as Olio on October 12, 2018, which "falsely suggests the Plaintiffs misrepresent the nature of their business" and states in part: "Buyer Beware." ("Olio Comment"). *Id.* ¶¶ 191-95.

- A comment published by an author identified as Jim on February 15, 2020, which states in part: "1000% incontrovertibly agree with the scammer comments here" and "No information or posting on losers but I'm sure I would be denied any type of honest, accurate, past performance without manipulation or hassle." Additionally, the comment states that Buckley's trading strategy "falls under mainly a fundamental view of trading with little to no consideration on technical analysis or other methodologies for a well-rounded, objective by analytical perspective." ("Jim Comment"). *Id.* ¶¶ 196-204.

Plaintiffs allege that Moore posted and responded to comments under his own name as well, but do not specifically quote any of those comments/responses in the Second Amended Complaint. *Id.* ¶¶ 208-10.

Plaintiffs engaged the services of a company called Business Image Lift, LLC ("BII") to seek removal of the Top Gun article from Defendants' website. *Id.* ¶ 221. On February 22, 2019, BII sent an email to Defendants that contained the URL for the Top Gun Article, stated that it contains "slanderous, defamatory material," and demanded removal of the URL. *Id.* ¶ 222; Ex. A [ECF No. 57]. BII sent the same or substantially similar emails to Defendants again on June 10, 2019, June 25, 2019, and September 24, 2019 (collectively, "BII Emails"). *Id.* ¶¶ 224-28. After Defendants failed to respond to the BII Emails, Plaintiffs retained a lawyer who sent a formal demand letter to Defendants on February 26, 2020 ("Demand Letter"). *Id.* ¶¶ 230-31.

The Demand Letter stated "this letter shall serve as a Formal Demand Letter for you to take down and remove any and all articles posted by Trading Schools.org in its entirety. More

specifically, the article posted on June 8, 2017 'Top Gun Options: A Paper Tiger?' under URL: https://www.tradingschools.org/reviews/top-gun-options/" and indicated that Defendants were "inaccurately reporting and spreading malicious information to damage Mr. Buckley's professional reputation." *Id.* ¶ 231, Ex. A.  Plaintiffs then proceeded to file this lawsuit in federal court on May 22, 2020 based on diversity jurisdiction.

The Second Amended Complaint, filed on December 4, 2020, asserts four counts.  ***First***, Plaintiffs allege that Defendants violated Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA"), FLA. STAT. section 501.201 *et seq.*, when they threatened to harm Top Gun Options by publishing deceptive, false, and misleading statements online unless they were paid $1,800.00—and then proceeded to publish such statements.  ***Second***, Plaintiffs allege that Defendants tortiously interfered with Plaintiff's prospective economic advantage by deterring individuals from using Plaintiffs' products and services through the publication of the Top Gun Article.  ***Third***, Plaintiffs allege that the Top Gun Article and the Mark, Sam, Olio, and Jim comments constitute defamation *per se*.  ***Fourth***, Plaintiffs plead claims of product disparagement and trade libel based on the Top Gun Article.

On December 7, 2020, Defendants filed the Motion, seeking dismissal on several grounds. Defendants argue that Plaintiffs' defamation count (Count III) must be dismissed because: (i) Plaintiffs did not provide sufficient pre-suit notice for any of the allegedly defamatory statements as required under section 770.01 of the Florida Statutes; (ii) Plaintiffs' defamation claims based on the Top Gun Article, the Mark September 25, 2017 Comment, and the Mark December 25, 2017 Comment are time-barred; (iii) the allegedly defamatory comments published within the statute of limitations are non-actionable opinion and/or rhetorical hyperbole; and (iv) Defendants

are immune from liability as to third-party comments on their website under the Communications Decency Act, 47 U.S.C. section 230 ("CDA"). *See* Mot. at 2-13.

Defendants then contend that the remaining counts in the Second Amended Complaint should be dismissed under Florida's "single action rule," which precludes Plaintiffs from proceeding on multiple counts for what is essentially the same defamatory publication or event. *Id.* at 17-19. Defendants also argue that Plaintiffs' FDUTPA claim fails because Plaintiffs failed to plead Defendants' violation of the statute occurred within the territorial boundaries of Florida, failed to plead actual damages, and failed to allege a consumer injury. *Id.* at 13-16. Finally, Defendants maintain the Court should apply Florida's Anti-SLAPP Statute to Plaintiffs' claims. *Id.* at 19-20.

## **LEGAL STANDARD**

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), "a complaint must include 'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Properties, L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1335 (11th Cir. 2012); *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Although the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (quotation omitted); *Iqbal*, 556 U.S. at 678.

In ruling on a motion to dismiss, "[a] court is generally limited to reviewing what is within the four corners of the complaint." *Austin v. Modern Woodman of Am.*, 275 F. App'x 925, 926

(11th Cir. 2008) (quoting *Bickley v. Caremark RX, Inc.*, 461 F.3d 1325, 1329 n.7 (11th Cir. 2006)). This includes attachments or exhibits provided with the complaint. *See Gill as Next Friend of K.C.R. v. Judd*, 941 F.3d 504, 511 (11th Cir. 2019) ("The Civil Rules provide that an attachment to a complaint generally becomes 'part of the pleading for all purposes,' Fed. R. Civ. P. 10(c), including for ruling on a motion to dismiss."). A court may also "consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed," meaning the authenticity of the document is not challenged. *Day v. Taylor*, 400 F.3d 1272, 1276 (11th Cir. 2005) (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002)). Further, "a document need not be physically attached to a pleading to be incorporated by reference into it; if the document's contents are alleged in a complaint and no party questions those contents, [the court] may consider such a document provided it meets the centrality requirement . . . ." *Id.*

## ANALYSIS

The Court finds that Plaintiffs' defamation count (Count III) must be dismissed because Plaintiffs failed to provide sufficient pre-suit notice as required by section 770.01. The Court therefore finds it unnecessary to reach Defendants alternative dismissal arguments for the defamation count (*i.e.*, that some of Plaintiffs' defamation claims are time-barred; that the non-time-barred statements constitute opinion or rhetorical hyperbole; and that the CDA bars Plaintiffs' defamation suit against Defendants for third-party comments posted on their website).

Additionally, Florida's single-action rule mandates dismissal of Counts II and IV for tortious interference with economic advantage and product disparagement and trade libel. However, the single-action rule does not preclude Plaintiffs' FDUTPA count (Count I) and the

Court finds that Plaintiffs have sufficiently stated a claim under FDUTPA. Further, the Court finds that application of Florida's Anti-Slapp Statute, section 768.295, is unwarranted in this action.

## I. *Plaintiffs' defamation claim (Count III) is dismissed due to insufficient pre-suit notice.*

Section 770.01 provides the procedure that must be followed prior to the filing of a suit for libel or slander:

> Before any civil action is brought for publication or broadcast, in a newspaper, periodical, or other medium, of a libel or slander, the plaintiff shall, at least 5 days before instituting such action, serve notice in writing on the defendant, specifying the article or broadcast and the statements therein which he or she alleges to be false and defamatory.

FLA. STAT. § 770.01. This pre-suit notice requirement "was enacted not only to ensure that newspapers and periodicals would be relieved, under the circumstances therein enumerated, of punitive damages, but also to afford to newspapers and periodicals an opportunity *in every case* to make a full and fair retraction in mitigation of the damages which a person may have suffered by reason of the publication." *Ross v. Gore*, 48 So. 2d 412, 415 (Fla. 1950). Ordinarily, a plaintiff's failure to comply with the pre-notice requirement requires dismissal of the complaint for failure to state a cause of action. *See Cousins v. Post-Newsweek Stations Fla., Inc.*, 275 So. 3d 674, 680 (Fla. 3d DCA 2019).

Plaintiffs contend that section 770.01's pre-suit notice requirement does not apply in this case because Defendants are "nonmedia defendants" and therefore not entitled to the protection of section 770.01. *See* Resp. at 4. Plaintiffs also argue that Defendants waived pre-suit notice by requesting in their Terms of Service that, absent a court order, readers not contact them to remove website content on the basis that it is false. *Id.* at 3. Finally, Plaintiffs insist that even if section 770.01's protections do apply to Defendants, the BII Emails and the Demand Letter complied with

the statute's pre-suit notice requirement. *Id.* at 5-6. The Court will address each of these arguments in turn.

### a. Applicability of Section 770.01 to Defendants' posts

Although the express language of section 770.01 does not limit the type of defendant entitled to pre-suit notice, Florida courts have concluded that the pre-suit requirement applies only to "media defendants," not to private individuals. *See Comins v. Vanvoorhis*, 135 So. 3d 545, 549 (Fla. 5th DCA 2014) (citing *Zelinka v. Americare Healthscan, Inc.*, 763 So. 2d 1173, 1175 (Fla. 4th DCA 2000)). However, the phrase "media defendants" in these cases "was not meant to distinguish between individuals and corporations, but rather to separate third parties who are not engaged in the dissemination of news and information through the news and broadcast media from those who are so engaged." *Id.* at 554 (quoting *Mancini v. Personalized Air Conditioning & Heating, Inc.*, 702 So. 2d 1376, 1380 (Fla. 4th DCA 1997)).

In several cases, courts have held that the words "other medium" in section 770.01 are expansive enough to include blogs—and that a blog will qualify as a "media defendant" for purposes of the pre-suit notice requirement if it is "operated to further the free dissemination of information or disinterested and neutral commentary or editorializing as to matters of public interest." *Comins*, 135 So. 3d at 557. For example, in *Comins*, the court concluded that pre-suit notice was required in a defamation action concerning an article about a dog shooting posted on a blog maintained by a doctoral candidate at the University of Florida, which purported to "publicly comment on issues of public concern in an intellectual manner." *Id.* at 548, 559. *Comins* defined a blog as "a site operated by a single individual or a small group that has primarily an informational purpose, most commonly in an area of special interest, knowledge or expertise of the blogger, and which usually provides for public impact or feedback." *Id.* at 559. The court stopped short of

ruling that pre-suit notice is required for *all* blogs or bloggers—but after surveying the caselaw addressing section 770.01 and considering the "transformative" emergence of blogs as a means of free dissemination of news and public comment—concluded that many are entitled to such protection.

Similarly, in *Alvi Armani Medical, Inc. v. Hennessy*, the court held that the owner, host, and publisher of a website called the "Hair Restoration Network," which was "dedicated to providing information to the consumer public about the hair restoration and transplant industry," was entitled to pre-suit notice under section 770.01. 629 F. Supp. 2d 1302, 1303-04 (S.D. Fla. 2008); *id.* at 1307-08. The court distinguished cases that held that a private individual who merely posted on a message board online did not fall within the ambit of section 770.01—and emphasized that in contrast, the Hair Restoration Network website "provides information to the consumer public" and "Defendants themselves had at least some part in making defamatory statements against Plaintiffs . . . ." *Id.* at 1308; *see also Plant Food Sys., Inc. v. Irey*, 165 So. 3d 859, 861 (Fla. 5th DCA 2015) (finding pre-suit notice was required for internet publisher of various purportedly scientific, technical, and medical journals and information).

Applying the principles from these cases here, the Court finds that Defendants are entitled to pre-suit notice under section 770.01 for their articles and posts on TradingSchools.org. The Court sees no material distinction between Defendants' website—which is operated to disseminate information to consumers about trading and investment products—and the website in *Hennessey* that provides information to consumers about the hair restoration industry. Whether or not Plaintiffs agree with the accuracy of Defendants' articles, TopSchools.org (as described in the Second Amended Complaint) falls squarely under *Comins*'s description of the type of blogs that constitute an "other medium" for purposes of section 770.01. If all it took to strip a website of

section 770.01's protections were allegations that the website's contents were false, the statute would be easily circumvented, if not eviscerated, in defamation actions.

### b. Waiver of Section 770.01 Pre-Suit Notice

The Court is also unpersuaded that Defendants waived pre-suit notice under section 770.01 by stating in the TradingSchools.org Terms of Service that, "unless you have obtained a valid court order proving that something in a post is false, please do NOT ask us to remove content on the grounds that it is false . . . [w]e are not the truth police and will not remove content just because someone has made an unverified claim that a post is false." Second Am. Compl. ¶ 218. Plaintiffs have not pointed to any cases—nor has the Court located any—indicating that such language excuses plaintiffs from adhering to the notice requirements set forth in section 770.01.

Plaintiffs instead rely on a medical malpractice case where the court found the petitioners waived pre-suit notice and investigation requirements by expressly insisting on arbitrating the respondents' claims. *See Meridian Pain & Diagnostics, Inc. v. Greber*, 197 So. 3d 153, 156 (Fla. 3d DCA 2016). But the general request in Defendants' Terms of Service that readers not contact them to remove content from their website does not constitute a comparable express waiver of statutory pre-suit requirements. Further, "Florida's Supreme Court has identified the opportunity to avoid litigation entirely as an important purpose of the pre-suit notice provision, due to the opprobrium consequent even to an unfounded suit for libel," *Tobinick v. Novella*, No. 14-80781, 2015 WL 1191267, at *7 (S.D. Fla. Mar. 16, 2015) (citation omitted). A finding of waiver based on the general language in Defendants' Terms of Service undercuts this objective.

### c. Sufficiency of Notice

The Court now turns to whether the BII Emails and Demand Letter constitute sufficient notice under section 770.01. Section 770.01 "requires the best possible notice," which differs

depending on whether the statement at issue is oral or in print. *See Nelson v. Associated Press, Inc.*, 667 F. Supp. 1468, 1474 (S.D. Fla. 1987). Although courts have permitted less specific notice in the context of oral statements, "[w]here the subject article is in print, the best possible notice under Florida Statutes Section 770.01 would include reference to the subject article and verbatim quotes from it." *Rendon v. Bloomberg, L.P.*, 403 F. Supp. 3d 1269, 1274 (S.D. Fla. 2019); *see also Nelson*, 667 F. Supp. at 1474 ("The best possible notice in this case would have been, at a minimum . . . to refer to the September 29, 1983 Miami Herald article and the November 5, 1983 New York Post article, and quote verbatim from them; because the fact is that Plaintiff was capable of doing so."); *Cousins*, 275 So. 3d at 680 (finding that for an *oral* statement, as opposed to a written statement, the notice standard is less exacting and "a pleader need only state the essence of what the alleged defamer said") (quotation omitted).

Here, Plaintiffs' notice to Defendants was insufficient under section 770.01 because although the BII Emails and the Demand Letter linked to the Top Gun Article, they did not specify the statements therein that Plaintiffs claim are defamatory, which is expressly required under the statute. *See* Section 770.01 (indicating that in the pre-suit notice, a plaintiff must "specify[] the article or broadcast *and the statements therein which he or she alleges to be false and defamatory*") (emphasis added); *see also Rendon*, 403 F. Supp. 3d at 1274 (finding that retraction letter that referenced article and generally summarized its false allegations was insufficient); *Fletcher v. S. Fla. Sun-Sentinel*, No. 05-4048, 2006 WL 2337176, at *1 (Fla. Cir. Ct. Jan. 30, 2006) (finding notice insufficient where plaintiff attached copy of article but "did not specify the statements within the column which she claimed were false and defamatory").

Indeed, Plaintiffs' notice is insufficient even if the Court applies a less exacting notice standard that does not require the allegedly defamatory statements to be quoted verbatim. The BII

Emails and Demand Letter did not even summarize the allegedly false statements from the Top Gun Article or provide any indication of what made the article false and defamatory. They merely linked the article and asserted generally that it is inaccurate, defamatory, and slanderous. The specificity with which the Second Amended Complaint alleges Defendants' defamatory statements demonstrates that it was far from impracticable for Plaintiffs to parse out the portions of the Top Gun Article with which they took issue. Furthermore, the BII Emails and the Demand Letter do not reference any of the comments posted below the Top Gun Article, which also form the basis of Plaintiffs' defamation claims and which Plaintiffs rely on to argue that the statute of limitations for the Top Gun Article defamation claim should be reset. The Court therefore finds that pre-suit notice under section 770.01 was insufficient for all the statements at issue in this case and that Count III of the Second Amended Complaint must be dismissed.

## II.  *Plaintiffs' Tortious Interference with Prospective Economic Advantage and Product Disparagement and Trade Libel Claims (Counts II and IV) are dismissed under Florida's Single Action Rule.*

Under Florida law, "a single publication gives rise to a single cause of action." *Callaway Land & Cattle Co. v. Banyon Lakes C. Corp.,* 831 So. 2d 204, 208 (Fla. 4th DCA 2002) (citation omitted). Consequently, "[t]he various injuries resulting from it are merely items of damage arising from the same wrong." *Id.* (citation omitted). This "single action rule" is "designed to prevent plaintiffs from circumventing a valid defense to defamation by recasting essentially the same facts into several causes of action all meant to compensate for the same harm." *Gannett Co., Inc. v. Anderson,* 947 So. 2d 1, 13 (Fla. 1st DCA 2006) (internal quotation marks and citation omitted). Pursuant to the single action rule, "courts dismiss concurrent counts for related torts based on the same publication and underlying facts as the failed defamation count." *Klayman v.*

*Jud. Watch, Inc.*, 22 F. Supp. 3d 1240, 1256 (S.D. Fla. 2014), aff'd (Feb. 17, 2015) (citations omitted).

Here, Plaintiffs' claims for tortious interference with prospective economic advantage (Count II) and product disparagement and trade libel (Count IV) must be dismissed under the single action rule. Both counts are based on the same underlying facts and intended to compensate for the same harm as Plaintiffs' defamation claim. *See* Second Am. Compl. at 29-34 (indicating that defamation *per se*, tortious interference with prospective economic advantage, and product disparagement and trade libel claims are all based on Defendants' publication of false statements about Plaintiffs in the Top Gun Article and the harm flowing from that publication); *see also Klayman*, 22 F. Supp. 3d at 1257 (dismissing claim for tortious interference with business contract because it relied on same online publication and underlying facts as the defamation count to assert different damages from the same injury); *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1321 (S.D. Fla. 2020) (dismissing plaintiff's claim for commercial disparagement because it stemmed from the same article as his defamation claim).

However, the Court disagrees with Defendants that the single action rule warrants dismissal of Plaintiffs' FDUTPA claim. The single action rule "only applies where the secondary counts are based solely on the facts underpinning the defamation count." *Club Exploria, LLC v. Aaronson, Austin, P.A.*, No. 18-00576, 2019 WL 5328738, at *4 (M.D. Fla. Oct. 21, 2019). Plaintiffs' FDUTPA count includes additional allegations that Defendants threatened to harm Top Gun Options by publishing deceptive, false, and misleading statements online unless they were paid $1,800. *See* Second Am. Compl. ¶¶ 261-62. Given that this allegation is not part of Plaintiffs' defamation count, dismissal of the FDUTPA count based on the single action rule is not appropriate. *See Club Exploria*, 2019 WL 5328738 at *4 (declining to dismiss FDUTPA count

that was not based solely on website statements underlying trade libel claim, but also included allegations "regarding letters Defendants gave to the [timeshare] owners").

### III. *Plaintiffs have sufficiently pleaded violations of FDUTPA.*

The Court must next determine whether Plaintiffs have adequately pleaded a violation of FDUTPA—the only remaining count. FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." FLA. STAT. § 501.204(1). To state a FDUTPA claim, "a plaintiff must show (1) a deceptive act or unfair trade practice, (2) causation, and (3) actual damages." *Molina v. Aurora Loan Servs., LLC*, 635 F. App'x 618, 626–27 (11th Cir. 2015) (citing *Dolphin LLC v. WCI Cmties., Inc.*, 715 F.3d 1243, 1250 (11th Cir. 2013)). An act or practice is deceptive if it is likely to mislead a consumer acting reasonably in the circumstances, to the consumer's detriment. *Kenneth F. Hackett & Assocs., Inc. v. GE Cap. Info. Tech. Sols., Inc.*, 744 F. Supp. 2d 1305, 1312 (S.D. Fla. 2010). "An unfair practice is one that offends established public policy and one that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers." *Id.* (quotation omitted).

Here, Plaintiffs have adequately pleaded a FDUTPA claim. Plaintiffs allege that Defendants engaged in deceptive conduct by threatening to harm Top Gun Options and publish misleading information to consumers if Plaintiffs did not pay $1,800. *See* Second Am. Compl. ¶ 261. Plaintiffs contend that they and consumers were harmed when Defendants published false information to deter reasonable consumers from associating and doing business with the Plaintiffs. *Id.* ¶¶ 262-65. Plaintiffs allege that as a direct result of Defendants' publication and to combat its negative effects, the Plaintiffs expended money on reputation management services. *Id.* ¶ 266. Plaintiffs have thus alleged each element required to state a claim under FDUTPA.

Defendants argue that Plaintiffs FDUTPA claim fails because: (i) Plaintiffs have not pleaded and cannot plausibly plead that Defendants were within the state of Florida when the violation of FDUTPA transpired; (ii) Plaintiffs have not sufficiently pleaded actual damages for their FDUTPA claim; and (iii) Plaintiffs have not alleged a consumer injury as defined by statute and case law for a FDUTPA violation. *See* Mot. at 13-16.

The Court disagrees. First, the Court finds that Plaintiffs have pleaded a sufficient relationship to the State of Florida to survive a motion to dismiss. The caselaw regarding FDUTPA's geographical reach is somewhat unclear and mostly focuses on whether out-of-state consumers can pursue a FDUTPA claim—as opposed to the circumstances in this case, where Plaintiffs are Florida-based and the dispute is whether enough of Defendants' conduct took place in Florida. *See Bank of Am., N.A. v. Zaskey*, No. 15-81325, 2016 WL 2897410, at *9 (S.D. Fla. May 18, 2016) (noting that the law on FDUTPA's applicability to out-of-state consumers is unclear, but finding that most courts have held that FDUTPA applies to out-of-state consumers "if the offending conduct took place predominantly or entirely in Florida.").

However, in *Barnext Offshore, Ltd. v. Ferretti Grp. USA, Inc.*, Judge Cecilia M. Altonaga addressed FDUTPA's geographical limitations more broadly. No. 10-23869, 2012 WL 1570057, at *5-7 (S.D. Fla. May 2, 2012). She concluded that although Florida's Third District Court of Appeal in *Millennium Communications & Fulfillment, Inc. v. Office of Attorney General* stated that violations of FDUTPA must have "transpired within the territorial boundaries" of Florida, *see* 761 So. 2d 1256, 1262 (Fla. 3d DCA 2000), there is nothing in FDUTPA's express language or the *Millennium* case suggesting that FDUTPA only applies where the conduct occurs *exclusively* in Florida. *Barnext,* 2012 WL 1570057 at *6. Judge Altonaga then held that "[g]iven the FDUTPA's broad, plain language, whether the FDUTPA applies to Defendants requires an inquiry

into the Court's personal jurisdiction over them." *Id*. Finding that Defendants "fail to explain why, if at all, personal jurisdiction is lacking over them such that FDUTPA does not apply," Judge Altonaga denied summary judgment for Defendants on that ground. *Id.* at *6-7.

As in *Barnext*, Defendants have not contended that the Court lacks personal jurisdiction over them. Additionally, Plaintiffs allege that the demand for $1,800 was directed to Buckley in Florida and that Florida consumers were misled by the deceptive Top Gun article. *See* Second Am. Compl. ¶¶ 14-17. At this stage, these allegations are sufficient to establish a relationship to Florida for purposes of asserting a FDUTPA claim. *See Romantic Tours, Inc. v. Anastasia Int'l, Inc.*, No. 10-02321, 2011 WL 653724, at *3 (M.D. Fla. Feb. 14, 2011) ("Although the alleged conduct occurred outside Florida, each party operates a commercial web site that provides to men in Florida (and throughout the United States) an introduction to women in Russia and Ukraine. Additionally, the complaint alleges intentional, harmful conduct . . . aimed at a Florida corporation and causing harm to Florida consumers. Accordingly, [Plaintiff] alleges facts sufficient to support a FDUTPA claim."); *see also Westgate Resorts, Ltd. v. Sussman*, 387 F. Supp. 3d 1318, 1365, n.31 (M.D. Fla. 2019) ("[T]hat this action involves out-of-state owners and entities does not place it outside FDUPTA's reach."); *Eli Lilly & Co. v. Tyco Integrated Sec., LLC.*, No. 13-80371, 2015 WL 11251732, at *4 (S.D. Fla. Feb. 10, 2015) ("[FDUTPA] does not limit its protection to acts occurring exclusively in Florida.").

The Court also finds that Plaintiffs have sufficiently pleaded a consumer injury. Although an entity does not have to be a consumer to bring a FDUTPA claim, it must still allege injury or detriment to consumers. *See Caribbean Cruise Line, Inc. v. Better Bus. Bureau of Palm Beach Cty., Inc.*, 169 So. 3d 164, 169 (Fla. 4th DCA 2015). Here, Plaintiffs' allegation that "[c]onsumers acting reasonably have been aggrieved by Defendants' unfair and deceptive practices . . . in that

they visited Defendants' Blog and reviewed the Top Gun Article, which caused them to refuse to do business or to continue to do business with Plaintiffs," Second Am. Compl. ¶ 265, is sufficient to satisfy the consumer injury element at the pleadings stage. *See Env't Mfg. Sols., LLC v. Fluid Grp., Ltd.*, No. 18-00156, 2018 WL 3635112, at *17 (M.D. Fla. May 9, 2018), report and recommendation adopted sub nom. *Env't Mfg. Sols., LLC v. Fluid Energy Grp., Ltd.*, No. 18-00156, 2018 WL 6264836 (M.D. Fla. Nov. 30, 2018) (finding plaintiffs sufficiently pleaded consumer injury by alleging "that Defendants made serious−and untrue−allegations about Plaintiffs, including claiming that they were the subject of federal investigations and that they falsified test results," and that consumers took action based upon those statements).

Finally, the Court finds that Plaintiffs have adequately pleaded actual damages for purposes of their FDUTPA claim. As mentioned above, to state a claim under FDUTPA, a plaintiff must plead actual damages, which Florida courts consider to be a "term of art" that does not include consequential damages. *See Casa Dimitri Corp. v. Invicta Watch Co. of Am., Inc.*, 270 F. Supp. 3d 1340, 1352 (S.D. Fla. 2017) (citing *Diversified Mgmt. Sols., Inc. v. Control Sys. Research, Inc.*, No. 15-81062, 2016 WL 4256916, at *5 (S.D. Fla. May 16, 2016)). "Consequential or special damages are those which do not necessarily result from the injury complained of or which the law does not imply as the result of that injury." *Id.* (quoting *BPI Sports, LLC v. Labdoor, Inc.*, No. 15-62212, 2016 WL 739652, at *6 (S.D. Fla. Feb. 25, 2016)) (internal quotation marks omitted). Examples of consequential damages include lost profits, diverted or lost sales, and reputation harm. *Id.* (citations omitted).

Although Defendants are correct that Plaintiffs' allegations of reputation harm, loss of goodwill, and loss of business would not establish actual damages for purposes of the FDUTPA claim, these are not the damages that Plaintiffs pleads as part of the FDUTPA count. Rather, in

Count I, Plaintiffs allege that they expended money on reputation management services as a result of Defendants' conduct, which is sufficient to plead actual damages under FDUTPA. *See PODS Enterprises, LLC v. U-Haul Int'l, Inc.*, 126 F. Supp. 3d 1263, 1286 (M.D. Fla. 2015) (finding that corrective advertising expenses Plaintiff had to incur to recover the diminished value of its brand constituted actual damages under FDUTPA).

For these reasons, the Court finds that Plaintiffs' FDUTPA claim (Count I) survives Defendants' Motion to Dismiss.

### IV. *Defendants' request that the Court apply Florida's anti-SLAPP statute to Plaintiffs' claims is denied.*

Florida's anti-SLAPP statute prohibits a person from filing a suit that is: (a) "without merit" and (b) "primarily" because the person against whom the suit was filed "has exercised the constitutional right of free speech in connection with a public issue[.]" FLA. STAT. § 768.295(3). As used in this provision, "free speech in connection with a public issue" means:

> any written or oral statement that is protected under applicable law and is made before a governmental entity in connection with an issue under consideration or review by a governmental entity, or is made in or in connection with a play, movie, television program, radio broadcast, audiovisual work, book, magazine article, musical work, news report, or other similar work.

*Id.* § 768.295(2)(a). The anti-SLAPP statute provides that "[t]he court shall award the prevailing party reasonable attorney fees and costs incurred in connection with a claim that an action was filed in violation of this section." *Id.* § 768.295(4).

At this stage in the litigation, the Court finds that application of the anti-SLAPP statute is unwarranted. As discussed above, Plaintiffs have sufficiently stated a claim under FDUTPA based on allegations that Defendants demanded money from Plaintiffs in exchange for not publishing misleading information about Plaintiffs' product. The Court therefore cannot conclude on the face

of the complaint that Plaintiffs' lawsuit was "primarily" filed to suppress Defendants' exercise of free speech. *See WPB Residents for Integrity in Gov't, Inc. v. Materio*, 284 So. 3d 555, 561 (Fla. 4th DCA 2019) ("The harm the statute seeks to prevent is the filing of the lawsuit for the purpose of suppressing the exercise of First Amendment rights."); *Pierre-Paul v. ESPN Inc.*, No. 16-21156, 2016 WL 4530884, at *2 (S.D. Fla. Aug. 29, 2016) (denying Defendant's request for attorney's fees under Florida's anti-SLAPP statute where two of three counts in the complaint survived dismissal).

## CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion [ECF No. 48] is **GRANTED IN PART**.

2. Counts II, III, and IV of Plaintiffs' Second Amended Complaint are **DISMISSED**.

3. A telephonic status conference is hereby set in this matter on **August 6, 2021 at 12:00 P.M.** The parties are instructed to call 1-877-402-9753 by no later than 11:55 A.M. The access code is 9372453 and the password is 0918. The Court requires that the parties appear via a landline (i.e., not a cellular phone or a speaker phone) if possible, for clarity.

4. Plaintiffs shall file a Third Amended Complaint in conformance with this Order on or before **August 9, 2021**.

**DONE AND ORDERED** in Fort Lauderdale, Florida, this 23rd day of July, 2021.

_____
**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**